STRASSBURGER (ANDERSON v.). See Case No. 364.

---

## Case No. 13,527.

STRATTON et al. v. BABBAGE.

[18 Law Rep. 94; 3 Liv. Law Mag. 586.]

District Court, D. Massachusetts. 1855.

SEAMEN—PORT OF DISCHARGE—COLORED SEAMEN —NEW SHIPPING ARTICLES.

1. A port where colored seamen are obliged to remain in jail or on board the vessel while she remains in port is not a port of discharge within the United States, unless at their option.

2. Consequently they are entitled to their wages, under the shipping articles, until their arrival at a port where they can be discharged in safety.

3. Such seamen required in such Southern port to sign new shipping articles at a reduced rate of wages, and doing so under protest, will not be bound by such articles, but will be entitled to recover the wages stipulated in the original shipping articles.

[See Azuria v. Insurance Co. of Pennsylvania, Case No. 691.]

This was a libel for seamen's wages on board brig Iddo Kimball, of which the respondent was master.

F. W. Sawyer, for libellants.
R. H. Dana, Jr., for respondent.

SPRAGUE, District Judge. The libellants, who are free colored seamen, joined this vessel at Halifax, Nova Scotia, and signed articles for a voyage thence to Europe, and thence "to a port of discharge in the United States," at the rate of $24 per month. The vessel went to England, and thence to New Orleans. The laws of Louisiana oblige a master of a vessel bringing free colored seamen to New Orleans, to give bonds in $1,000 to take every such seamen out of the state in his vessel, or to see that they go in some other vessel before he sails. While in port, the men must live on board the vessel, or in jail. The master stated the law to the men, and told them they might stay on board and work, and he would allow them the current wages, which were $15 per month, from the day of arrival in New Orleans. The vessel lay some three weeks in New Orleans, and then sailed for Boston. On the day of sailing, the master required the crew to sign articles for the voyage from New Orleans to

Boston for $15 per month, including the time they lay in New Orleans. They signed the articles, but under protest.

The question is, whether New Orleans is "a port of discharge" for free colored seamen. Upon reflection, I am of opinion that a port in the slave states, where laws of this description prevail, is not a port of discharge for colored seamen. They cannot be, in any just sense of the term, discharged from the vessel. They are not free to go where they please, and to find other voyages. They must be either in jail or on board this vessel, and must go to sea in this vessel, or in such other as the master may find for them. They cannot even leave the vessel without the hazard of being made slaves. The master is under obligations also, being compelled to keep them, at great pecuniary risk, whether he will or no. Neither party is clear of the other. I do not mean to decide that such a port may not be treated as a port of discharge, if the seamen choose so to treat it. If they freely change their vessel, or freely make new terms with the master, I do not mean to say that they may not do so. It is not necessary to pass upon that question. But it cannot be treated as a port of discharge as against colored seamen. As New Orleans was not "a port of discharge," as against these men, they were entitled to proceed to Boston in the vessel at the original rate of wages. They did not waive this right freely, or for a valuable consideration, but made the new contract under duress and under protest, and for no consideration.

Decree for the libellants for full wages, to the arrival in Boston, with certain additional wages as compensation for short provisions, and certain deductions for refusal of duty, and for the sickness of a seaman by his own fault.